# UNITED STATES DISTRICT COURT
## District of Kansas

UNITED STATES OF AMERICA,

        Plaintiff,

    v.                          CASE NOS.   25-CR-20031
                                                     18-CR-20027 (revocation)

ERIK HUSETH

        Defendant.

## GOVERNMENT'S SENTENCING MEMORANDUM

**COMES NOW**, the United States of America, by and through Assistant United States Attorney Audrey McCormick, and requests the Court accept the Rule 11(c)(1)(c) agreement jointly proposed by the parties and sentence the defendant to 15 years of imprisonment for case number 25-CR-20031. Further, the United States requests that the Court impose a lifetime term of supervised release to follow and order restitution and assessments as outlined below. The United States further requests the Court revoke defendant's probation and impose a 10-year sentence in case number 18-CR-20027 and a lifetime term of supervised release to follow. Finally, the United States requests the 15-year sentence 25-CR-20031 and 10-year sentence in 18-CR-20027, in addition to the lifetime terms of supervised release, run concurrently. In support of its requests, the United States provides the following for the Court's consideration:

1

## I.     RULE 11(c)(1)(c) AGREEMENT IS PRESUMPTIVELY REASONABLE

On June 24, 20205, the parties presented this Court with the proposed Rule 11(c)(1)(c) agreement. (25-CR-20031, Doc. 13). The agreement has been reached between the parties after much negotiation and thoughtful consideration regarding all of the surrounding circumstances involving the defendant as outlined in great detail in the Presentence Investigation Report ("PSR") (25-CR-20031, Doc. 18) and the prior Court's Memorandum and Order on Sentencing (18-CR-20027, Doc. 73).

The agreement proposes a 180-month sentence, or 15 years, for Count 1, Distribution of Child Pornography in case number 25-CR-20031. Pursuant to the Presentence Investigation Report, "based upon a total offense level of 34 and a criminal history category of I, the guideline imprisonment range is 151 months to 188 months [12.5-15.5 years]." (25-CR-20031, Doc. 18, ¶ 81.) Neither party has lodged objections to the PSR calculations. *Id*. at ¶ 138-139. Therefore, the proposed Rule 11(c)(1)(c) sentence is within the properly calculated guidelines range, on the high end, and presumptively reasonable. *United States v. Blair*, 933 F.3d 1271, 1274 (10th Cir. 2019).

## II.     SUPERVISED RELEASE

The range of supervised release to be considered by the Court for both cases is 5 years to life. 18 U.S.C. §3583(k). The government is requesting a lifetime term of supervised release in each case, which shall run concurrent to one another. 18 U.S.C.A. § 3624(e).

Pursuant to the United States Sentencing Commission Guidelines (U.S.S.G.) § 5D1.2(c) policy statement, "the statutory maximum term of supervised release is recommended" for any sex offenses. "The court should ensure that the term imposed on the defendant is long enough to address the purposes of imposing supervised release on the defendant" U.S.S.G. §5D1.2 n. 4.

The factors to be considered when determining the length of the term of supervised release are the same the Court is to consider when determining what term of imprisonment to impose. U.S.S.G. §5D1.1 n. 3, 18 U.S.C. § 3583(c).

Defendant was prosecuted for almost identical conduct and circumstances in case number 18-CR-20027 as he has now plead guilty to in 25-CR-20031. (18-CR-20027, Docs. 12 & 73; 25-CR-20031, Doc. 13 & 18). In both cases, defendant was distributing child pornography through a peer-to-peer program, in addition to possessing child pornography. In his first case, the documented criminal behavior stemmed from July 2014-November 2014, with defendant admitting to viewing child pornography every 4-5 days. (18-CR-20027, Doc. 12). Defendant's child pornography collection from his first case was approximately 12,500 files and included 53 known series victims. *Id*. In the new case, defendant's documented distributions occurred from December 2023-May 2024, a decade later. (25-CR-20031, Doc. 13). Defendant's newly amassed child pornography collection included over 11,000 files and over 100 known series victims. (25-CR-20031, Doc. 13 & 18, ¶ 19).

Through his pre-trial and probation conditions related to his first case, he was afforded significant services, support, and oversight through US Probation to identify and address the criminal compulsions that lead to the first case. Those efforts failed. Not because US Probation failed to provide adequate support or oversight, or because defendant lacked familial support or resources, but because defendant's criminal compulsions and sexual interest in children were so strong, nothing could stop him, including the imminent threat of significant prison time.

Extended terms of supervised release are appropriate in sex cases, even if there is no documented history of hands-on offending, due to general lack of reporting of sex crimes, difficulty in measuring recidivism for sexual offenders, and threat of harm to the public. These

3

concerns undoubtedly fueled much of the legislative developments in the 2000s that resulted in the current ranges of punishment and supervised release that are in effect today.

In 2001, the United States Sentencing Guideline §5D1.2(c) was first amended to include the recommendation that "if the instant offense of conviction is a sex offense, the statutory maximum term of supervised release is recommended." The amendment came in response to the Protection of Children from Sexual Predators Act of 1998, Pub. L. 105-314, and to "effectuate the Commission's intent that offenders who commit sex crimes receive appropriate treatment and monitoring." U.S.S.G. §5D1.2(c) Editor's Note. (*See, United States v. Young*, 502 Fed. Appx. 726, 729 (10th Cir. 2012) (lifetime supervised release for possession of child pornography conviction was reasonable. The court summarized several sister circuit's similar findings which held the lifetime supervision policy statement of U.S.S.G. §5D1.2(b)(2) "reflects the judgment of Congress and the Sentencing Commission that a lifetime term of supervised release is appropriate for sex offenders in order to protect the public" and "because such criminal conduct may reflect deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison."))

Next came the Prosecutorial Remedies and Tools Against the Exploitation of Children Today Act of 2003 (PROTECT ACT), PL-108-21, 117 Stat. 650. The PROTECT ACT raised the *ceiling* on supervised release for sex offenses from five years to life and, among other items, removed any statute of limitations for crimes involving the physical or sexual abuse of a child. Subsection (k) appears for the first time in 18 U.S.C. 3583, effective April 30, 2003, and states that the authorized term of supervised release for any offense involving a minor, including possession of child pornography, is "any term of years or life." The Adam Walsh Child Protection and Safety Act of 2006 further highlighted the need for increased monitoring and

4

treatment of sex offenders through supervised release. Pub. L. 109-248.  Section 141 of the Adam Walsh Act amended 18 U.S.C. 3583(k), effective July 27, 2006, and raised the *floor* on supervised release for sex offenders, "any term of years not less than 5, or life."

The U.S. Sentencing Commission's 2021 report on <u>non-production</u> sex offenders further acknowledges the flaws in recidivism research for sex offenders and provides a warning that the "dark figure" of crime "looms large in sexual offenses against children, which often go unreported or undetected…accordingly, any research on sex offender recidivism based on reported arrests, including the Commission's recidivism findings, should be viewed as a conservative measurement of actual recidivism[1]." U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography: Non-Production Offenses*, 63 (2021).

As summarized by a recent research brief authored by Roger Przybylski and published by the Department of Justice, in conjunction with the National Criminal Justice Association on Recidivism of Adult Sexual Offenders:

> The recidivism of sex offenders is difficult to measure.  The surreptitious nature of sex crimes, the fact that few sexual offenses are reported to authorities, and the variation in the ways researchers calculate recidivism rates all contribute to the problem.
>
> Research has clearly shown that many sex offenses are never reported to authorities…in addition, only a subset of sex offenses that are reported to law enforcement result in the arrest of the perpetrator.  Given these dynamics, there is widespread recognition that the officially recorded recidivism rates of sexual offenders are a diluted measure of reoffending.[2]

---

[1] Commission cited to the following in support of its assertion that sexual crimes are underreported: William G. Skogan, *Dimensions of the Dark Figure of Unreported Crime*, 23 Crime & Delinquency 41, 50 (1977); Nicholas Scurich & Richard S. John, *The Dark Figure of Sexual Recidivism*, 37 Behav. Sci. & The Law 158 (2019); Ryan C.W. Hall & Richard C.W. Hall, *A profile of Pedophilia: Definition, Characteristics of Offenders, Recidivism, Treatment Outcomes, and Forensic Issues*, 82 Mayo Clinic Prosc. 457, 460-61 (2007) (noting that studies show that only an "estimated 1 in 20 cases of child sexual abuse is reported or identified" and that "an arrest was made in only 29% of reported juvenile sexual assaults.")

[2] Roger Przybylski, Recidivism of Adult Sexual Offenders, 1 (2015); article can be retrieved https://smart.ojp.gov/somapi/chapter-5-adult-sex-offender-recidivism

Roger Przybylski, *Recidivism of Adult Sexual Offenders*, 1 (2015).

These legislative developments, based on research in the field, speak to the well-known difficulties in protecting the public from sex offenders by increasing the amount of time to discover and prosecute said crimes and increasing the amount of time in which sex offenders can be closely monitored, treated, and reintegrated. The common denominator in all the legislative and research developments in the field since the turn of the century is: *time*.

As it relates to the present case, defendant's documented recidivism began during his pre-trial term in the first case – although not discovered until the second investigation began. Forensic review of defendant's mother's unmonitored laptop, which was seized in the second investigation, revealed that defendant was using an uTorrent program in June of 2018, after his arrest and arraignment in the first case, and routinely searching for magnet links, which contain information to get a torrent file. While reviewing mother's unmonitored laptop as part of the new case, investigators found the following Discord communication between defendant and another user dated May 22, 2018-June 22, 2018 (after his arrest and arraignment on the first case):

> On May 22nd, 2018, the user sends the following messages to @Hexasty:
> "on a computer they dont monitor, dont mention this in game or anything"
> "mom's computer"
> "yes i live with my parents...lol...lawyer bills"
> "well they have access to my computer so i think anything i see in wow they can see"
> "basically im on the honor system with my parents' computers so it's a good thing i live here"
> "no but ive had a flip phone ever since getting in trouble"
> "if they didnt take this plea i was looking at a 5-25 year range"
> when asked what they did, the user replies "kiddy porn"
> "i used emule so they downloaded it from me"
> "hence the 5-25 year thing because i was unwittingly giving it to people"
> "the bad thing is i have to register as a sex offender...after hearing what all it entails id rather go to jail a couple years"

It is clear that defendant was already taking significant steps to avoid detection by US Probation while the first case was litigated by using his mother's unmonitored laptop, which is the device used for his child pornography trafficking that is subject to his second prosecution.

6

While the prior Court concluded, after extensive litigation regarding defendant's Autism Spectrum Disorder (ASD) and without the benefit of knowing defendant was still engaged in his criminal conduct, that defendant appeared to be a low risk to recidivate, forensic review of his mother's unmonitored laptop reveals that defendant's child pornography trafficking likely never stopped.  In addition to the significant amount of torrent activity from 2018, in April 2022, just 5 months after being placed on probation in his first case, defendant admitted to Probation that he used his mother's unmonitored laptop to access pornography involving a "young-looking" adult role playing as a young girl.  (25-CR-20031, Doc. 13 & 18 ¶ 11).  His mother's unmonitored laptop shows uTorrent distribution activity starting as early as June 2023 and continuing until the execution of the residential search warrant in late May 2024.  Defendant even logged "deviant" days and thoughts of minors or viewing media containing minors in his daily planner, found during the second investigation, further exhibiting the extent of his desires and inability to stop them.  (25-CR-20031, Doc. 13).

While defendant is facing a significant amount of prison time between the two cases, the purpose of supervised release fulfills rehabilitative purposes that are separate and distinct from those served by incarceration.  *United States v. Johnson*, 120 S.Ct. 1114, 1118-19 (2000) ("The primary goal of supervised release is to ease the defendant's transition into the community after the service of a long prison term for a particularly serious offense…").  While defendant may be in his early 50's upon release, should the Court accept the proposed agreement, defendant's documented criminal conduct "reflect[s] deep-seated aberrant sexual disorders that are not likely to disappear within a few years of release from prison." *Young*, 502 Fed. Appx. 726, 729 (10th Cir. 2012).  For all the aforementioned reasons, the government respectfully requests the Court order a lifetime term of supervised release.

Further, given how rapidly technology advances, it is difficult to fully address what conditions of supervised release will be most appropriate for defendant when he released, given the nature of his offenses and longstanding criminal conduct. The government fully supports the mandatory, standard, and special conditions outlined in the PSR (25-CR-20031, Doc. 18 ¶ 90-122). However, the government requests that the Court order a hearing be held shortly before or after defendant's release so the parties can modify conditions as appropriate.

## III.  RESTITUTION

Of the 118 known child pornography series victims identified in defendant's collection of child pornography, which exceeded 11,000 files, 13 victims have requested restitution. (25-CR-20031 Doc. 18, ¶ 21). Per defendant's plea agreement, he has agreed to pay restitution in an amount of *at least* $3,000 per identified victim who requests restitution prior to sentencing. (25-CR-20031 Doc. 13, ¶ 10). Each series victim has requested amounts between $3,000-$10,000. Documentation to support those requests has been provided to the defense in discovery. It is the government's understanding that defendant is not contesting the restitution amounts requested by the 13 series victims.

The amounts requested are appropriate. The United States Sentencing Commission's 2012 "Report to Congress: Federal Child Pornography Offenses"[3] noted the manner of harm caused to victims of offenses like those in this case:

> Child pornography victims face other types of victimization that that are separate from the harm of production. Even after the physical abuse has ended, child pornography victims suffer due to continued circulation of their images or the ongoing potential for circulation of their images. Both Congress and the Supreme Court have concluded that the ongoing distribution of child pornography images violates the victim's privacy and exacerbates the continued harms to the victim. Congress has spoken about ongoing circulation, noting that "its continued existence causes the child

---

[3] The Report is available online at https://www.ussc.gov/research/congressional-reports/2012-report-congress-federal-child-pornography-offenses (last accessed Aug. 6, 2024).

>victims of sexual abuse continuing harm by haunting those children in future years." The Supreme Court likewise has described child pornography images as "a permanent record" and explained that "the harm to the child is exacerbated by their circulation." It further noted that this is a harm distinct from that caused during the production of the images: it is "the pornography's continued existence caus[ing] the child victims continuing harm by haunting the children in years to come."
>
>Unlike child sex abuse victims whose abuse has not been recorded, child pornography victims "grow up knowing that there are images of [themselves] being sexually abused which are available in perpetuity." For this reason, child pornography victims are subject to a greater long-term risk of depression, guilt, poor self-esteem, feelings of inferiority, interpersonal problems, delinquency, substance abuse, suicidal thoughts, and post-traumatic stress disorder than other child sexual assault victims. As one victim stated, "[u]nlike other forms of exploitations, this one is never ending. Everyday people are trading and sharing videos of me as a little girl being raped in the most sadistic ways."
>
>Victims have reported suffering from the knowledge that the images of their graphic abuse are being utilized for sexual gratification. They also state that they fear that the images are being used to groom new victims for sexual abuse. One victim explained, "I am horrified by the thought that other children will probably be abused because of my pictures. Will someone show my pictures to other kids . . . then tell them what to do? Will they see me and think it's okay for them to do the same thing?"
>
>Victims suffer from not knowing who has seen their images. Victims "report remaining always vigilant and fearful that any interaction with a computer might lead to exposure of the images of the sexual abuse that they have endured." Victims fear that strangers they see on the street have seen images of their abuse, and they are ashamed and embarrassed that a teacher, a potential date, or a stranger in public will recognize them. One victim explained that "[e]very day of my life I live in constant fear that someone will see my pictures and recognize me and that I will be humiliated all over again. It hurts me to know someone is looking at them — at me — when I was just a little girl being abused for the camera."

2012 Report, Chapter 5, pp. 112-13 (footnotes omitted).

The government requests the Court order restitution be paid as outlined in the PSR, paragraph 21, totaling $100,000.

9

## IV.     CHILD PORNOGRAPHY ASSESSMENT

This assessment is also known as the Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018 or "AVAA.[4]"  Pursuant to 18 U.S.C. §2259A, "in addition to any other criminal penalty, restitution, or special assessment authorized by law, the court shall assess…not more than $35,000 on any person convicted of a child pornography distribution offense…In determining the amount of the assessment…the court shall consider the factors set forth in subsections 3553(a) and 3572."  Further imposing this assessment "does not relieve a defendant of, or entitle a defendant to reduce the amount of any other penalty by the amount of the assessment."

In *United States v. Gentry*, the Tenth Circuit reviewed an AVAA assessment as it relates to the above stated factors:

> Section 3553(a) sets forth the factors a court should consider in imposing a sentence. These factors are (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed—(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the applicable guidelines; (5) any pertinent Sentencing Commission policy statement; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.
>
> Section 3572 sets forth the factors a district court should consider in determining whether to impose a fine, and the amount, time for payment, and method of payment of a fine. Together with the factors set forth in §3553(a) the court must consider: (1) the defendant's income, earning capacity, and financial resources; (2) the burden that the fine will impose on the defendant, any person who is financially dependent on the defendant, or any other person (including a government) that would be responsible for the welfare of any person financially dependent on the defendant, relative to the burden that alternative punishments would impose; (3) any pecuniary loss inflicted upon others as a result of the offense; (4) whether restitution is ordered or made and the mount of such restitution; (5) the need to deprive the defendant of illegally obtained gains from the offense; (6) the expected costs to the government of any imprisonment, supervised release, or probation component of the

---

[4] Effective December 7, 2018, Pub. L. No. 115-299, 132 Stat. 4383.

sentence; (7) whether the defendant can pass on to consumers or other persons the expense of the fine; and (8) whether the defendant is an organization.

2024 WL 177693 (January 17, 2024) (holding that while the District Court need not specify every single factor for the record, the record must show that these factors were considered by the Court prior to issuing the assessment.)

While the government is seeking a restitution order for the series victims in this case, an AVAA assessment shall still be assessed against the defendant, as they serve different purposes under different legal authority:

> After the enactment of the AVAA, there are several distinct, independent financial consequences that may be imposed, and in some cases must be imposed, on individuals convicted of child pornography offenses. See 18 U.S.C. §§ 3013, 3014, 2259, and 2259A…Restitution may be imposed if the Government offers adequate proof of causation and losses incurred by any identified victim, but a special assessment is imposed in the same manner as a fine and does not require the identification of any individual victim. Special assessments paid pursuant to Section 2259A do not go to a specific victim, but rather are deposited and pooled in the 'Child Pornography Victims Reserve' established in 18 U.S.C. §2259B. Restitution under 18 U.S.C. §2259 requires identification of a victim and proof of losses, but a special assessment under 18 U.S.C. § 2259A does not. The district court did not err in assessing a monetary penalty under the AVAA. Because a monetary penalty under the AVAA is separate and distinct from restitution, and a special assessment under 18 U.S.C. § 2259A does not require identification of a victim and proof of losses, the district court did not err in assessing a monetary penalty under the AVAA.

*United States v. Madrid*, 978 F.3d 201, 206 (5th Cir. 2020).

The AVAA established the Child Pornography Victims Reserve or the Defined Monetary Assistance Victims Reserve/DMA Victims Reserve, which is part of the Federal Crime Victims Fund, administered by the Office for Victims of Crime (OVC).[5] A child pornography victim who does not initially request or receive restitution may be entitled to receive a one-time payment from this fund. As of the filing of this pleading, over 100 series victims have not

---

[5] For more detail, please see
https://www.justice.gov/dmavr#:~:text=About%20the%20DMA%20Victims%20Reserve,-The%20DMA%20Victims&text=The%20DMA%20Victims%20Reserve%20is%20funded%20by%20assessments%20and%20penalties,of%20%2435%2C000%20from%20this%20fund.

11

requested restitution. Victims may not initially request restitution for a variety of reasons to include wanting to give a hands-on victims restitution priority or that receiving the restitution is a painful reminder of the crimes that have continuously been perpetuated against them. The AVAA fund provides them future safety net of funds, should they need them. It is therefore appropriate for the Court to order an AVAA assessment in the present case, after appropriately assessing the above referenced factors, in an amount not to exceed $35,000. The government asserts that, based on the above referenced factors and the outstanding series victims who have not requested restitution, a $35,000 AVAA assessment is appropriate.

## V.     JUSTICE FOR VICTIMS OF TRAFFICKING ACT (JVTA)

The Justice for Victims of Trafficking Act of 2015, 18 U.S.C. § 3014, or JVTA assessment, requires the court to assess "an amount of $5,000 on any non-indigent person" convicted pursuant to chapter 110. This assessment is paid after defendant has "satisfied all outstanding court-ordered fines, orders of restitution, and any other obligation related to victim-compensation…" and is a source of funding for "health care or medical items or services to victims…"

Unfortunately, as of the filing of this pleading the federal government has shut down and the mandatory $5,000 special assessment provided in 18 U.S.C. §3014 expired on September 30, 2025. Absent Congress enacting legislation to revive Section 3014 prior to the October 21, 2025 sentencing, no such assessment should be ordered. However, if such legislation is enacted and reflects a clear intent to apply retroactively, the government will be requesting the Court order a JVTA assessment.

The defendant has the burden of establishing indigency. *United States v. Janatsch*, 722 Fed.Appx. 806, 810-11 (10th Cir. 2018). Even those defendants with court appointed attorneys

have lawfully been ordered to pay this special assessment and taking into consideration the defendant's future earning capacity is appropriate.  *United States v. Bonilla*, 743 Fed.Appx. 210, 216 (10th Cir. 2018).  Defendant has hired private counsel for both of his cases and the PSR indicates he has sufficient income, education, and earning capacity.  Therefore, defendant should be ordered to pay the JVTA, should legislation permit.

Finally, having to pay the restitution, AVAA, JVTA, and special assessment will be an ongoing reminder to the defendant of the impact of his criminal conduct and, hopefully, an additional incentive to not repeat his behaviors.

## VI.     2018 CASE DISPOSITION

Defendant has stipulated to violating his probation and will be sentenced for that revocation simultaneously with his new offense.  The maximum sentence defendant can receive in 18-CR-20027 is 10 years. (18-CR-20027, Doc. 12).  The maximum sentence defendant can receive in 25-CR-20031 is 20 years. (25-CR-20031, Doc. 18 ¶ 80).  U.S.S.G. §5G1.3(d) does permit the court to run the sentences concurrently, partially concurrently, or consecutively.  The government is mindful that the United States Sentencing Commission's policy recommendation wherein a defendant who is on federal probation and commits a new offense is to run the sentence for the instant offense *consecutively* to the sentence imposed for the probation revocation.  U.S.S.G. §5G1.3, Application Note 4(c).  For the present case, that would mean a total of 30 years in prison, double what the parties are jointly proposing to the Court and almost double the high-end of the U.S.S.G. range for the new case (which takes into consideration the prior for criminal history category calculation).

The government is also mindful of U.S.S.G. §5G1.3, Application Note 4(A), which provides the factors the Court should consider when making the consecutive v. concurrent decision. Those factors include:

(i) The factors set forth in 18 U.S.C. § 3584 (referencing 18 U.S.C. § 3553(a));
(ii) The type…and length of the prior undischarged sentence;
(iii) The time served on the undischarged sentence and the time likely to be served before release;
(iv) …
(v) Any other circumstance relevant to the determination of an appropriate sentence for the instant offense.

While consecutive sentences would be appropriate in many, if not most, similarly situated cases, the parties in this case have at their disposal a significant record regarding defendant's ASD, an indisputably permanent, lifelong disorder, which the government finds to be a mitigating factor. Additionally, while defendant did not immediately take responsibility for his continued criminal involvement when speaking to on-scene investigators during the execution of the search warrant in May 2024, defendant and his attorney contacted the government shortly thereafter and maintained communication with the government throughout the pre-file stage such that the proposed global disposition was reached before the new case was filed. That agreement included defendant waiving detention (25-CR-20031, Doc. 5) and indictment (25-CR-20031, Doc. 6), issuing notice of intent to plead guilty at the earliest opportunity (25-CR-20031, Doc. 10), and pleading guilty at the earliest opportunity (25-CR-20031, Doc. 11). Defendant had plead guilty within about 30 days of his self-surrender in this matter, evidencing his acknowledgement of his criminal conduct and saving the government and court valuable time and resources.

Up until his self-surrender, defendant had not served time in custody. A 15-year sentence for someone in defendant's position, with defendant's documented ASD, will serve the

sentencing purposes outlined in 18 U.S.C. § 3584 and 18 U.S.C. § 3553(a), and is sufficient, but not greater than necessary.

## VII. CONCLUSION

For all the aforementioned reasons, the government requests the Court accept the Rule 11(c)(1)(c) agreement, impose a sentence of 15 years for 25-CR-20031, impose concurrent lifetime terms of supervised release in each case, order restitution for the identified series victims in 25-CR-20031 in an amount totaling $100,000, order an AVAA/Child Pornography Assessment in 25-CR-20031 in the amount of $35,000, order a mandatory special assessment of $100 in 25-CR-20031, impose a 10 year sentence in 18-CR-20027, run the sentences for 25-CR-20031 and 18-CR-20027 concurrently, for a total of 15 years imprisonment, and any other relief that the Court deems just under the circumstances.

Respectfully Submitted,

RYAN A. KRIEGSHAUSER
United States Attorney
District of Kansas

*s/Audrey McCormick*
AUDREY MCCORMICK, D.Kan. #24847
Assistant United States Attorney
500 State Ave., Suite 360
Kansas City, KS 6617
Tele: (913) 551-6730
Fax: (913) 551-6541
e-mail: Audrey.McCormick@usdoj.gov

**CERTIFICATE OF SERVICE**

I certify that on October 14, 2025, I electronically filed this motion with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all attorneys of record.

/s/Audrey McCormick
Audrey McCormick
Assistant United States Attorney